J-A06016-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| B.J.F., N/K/A B.J.S. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| J.P.F. | |
| Appellee | No. 1938 MDA 2015 |

Appeal from the Order Entered October 2, 2015
In the Court of Common Pleas of York County
Civil Division at No(s): 2013-FC-000212-03

BEFORE:  LAZARUS, J., STABILE, J., and DUBOW, J.

MEMORANDUM BY LAZARUS, J.:                      **FILED APRIL 18, 2016**

B.J.F., N/K/A B.J.S. (Mother) appeals from the order of the Court of Common Pleas of York County that granted to J.P.F. (Father) primary physical custody of the parties' Child (born 6/15/04).  After careful review, we affirm.

In 2013, the parties were living separately in Hanover, York County. Child was living with Mother.  On March 21, 2013, Mother filed a custody complaint requesting primary physical custody.  On April 18, 2013, she filed a notice of proposed relocation indicating her intention to move with the parties' child to Quarryville, Lancaster County, which is 52 miles from Father's residence.[1]

---

[1] Section 5337(c) of the Child Custody Act, 23 Pa.C.S. § 5337(c), sets forth specific requirements for the notice of relocation.

By order filed August 15, 2013, the court granted primary physical custody to Father, which had the effect of denying Mother's request to relocate Child.

In June 2013, Mother moved to Quarryville where she lives with her fiancé. On April 8, 2015, Mother filed a petition for modification seeking primary physical custody of Child. On July 7, 2015, she filed a notice of proposed relocation indicating her desire to exercise primary physical custody of Child in Quarryville, where she and her fiancé were awaiting the birth of their son.

The court held hearings on September 24 and 29, 2015, and by order filed October 2, 2015, the court directed that primary physical custody of Child remain with Father.

This timely appeal followed in which Mother raises the following issues for our review:

1. Did the trial court err in that it did not give adequate consideration to or properly interpret the well-reasoned preference of Child to spend more time with Mother during the week, as the court abused its discretion in determining that the child did not want to live primarily with Mother or change schools?

2. Did the trial court err in that it did not give adequate consideration to the close, living emotional connection between Mother and Child?

3. Did the trial court err in that it did not give adequate consideration of Mother's full time availability to care for Child and in its determination that Father's utilization of third party child care is equal to Mother's full time availability to care for Child?

4. Did the trial court err in that it did not give adequate consideration to the strong relationship that Child shares with his sibling in Mother's home?

5. Did the trial court err in its determination that Father should retain primary physical custody by not giving adequate consideration of Father's calculated pattern of conduct to discourage and limit frequent and continuing contact between Child and Mother, to father's intentional disparagement of Mother through social media, and to Father's lack of cooperation with Mother with regard to communicating school information and medical information and to issues of co-parenting?

6. Did the trial court err in that it did not give adequate consideration to Father's home environment and Child's exposure to inappropriate video and media?

7. Did the trial court err in its determination that there is no indication that living primarily with Mother would enhance Child's life?

8. Did the trial court err in its determination that Child has extended family in the area of Father's home that are active in Child's life and failing to give adequate consideration to the extended family and friends of child in close proximity to Mother's home?

9. Did the trial court err in that it gave improper consideration to attendance at Child's doctor and dentist appointments?

10. Did the trial court err in that it did not give adequate consideration to Father's financial situation with regard to Father's home in its determination that Child should remain with Father?

Our scope and standard of review are well settled:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses

first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*G.A. v. D.L.*, 72 A.3d 264, 268 (Pa. Super. 2013) (citations and quotations omitted).

As an initial matter, we note this Court has held that "where neither party is relocating, and only the custodial rights of the parties are at issue, section 5337 of the Child Custody Act is not *per se* triggered." *D.K. v. S.P.K.*, 102 A.3d 467, 474 (Pa. Super. 2014). Nevertheless, "[i]n a custody case where neither parent is relocating, but the children stand to move a significant distance, trial courts should still consider the relevant [relocation] factors of section 5337(h) in their section 5328(a) best interests analysis." *Id.* at 476.

Here, in an opinion supporting the October 2, 2015 custody order, the trial court engaged in a relocation factor analysis as well as a best interests analysis, thus conforming with the requirements of *D.K.*

On appeal, Mother first argues that the trial court did not give adequate consideration to Child's preference to spend more time with her during the week.

At the September 24, 2015 hearing, the court held an interview with Child in a jury room with counsel present. The following exchange took place between the court and Child:

Q:    The schedule right now, during the school year you are primarily with your dad and you see your mom most weekends, and then during the summertime you spend a little bit more time with your mom than your dad.

A:    Yes.

A:    How is that schedule going?

A:    Pretty well so far.

Q:    Do you like it, no problems at all?

A:    I mean, I would like to see my mom more during the school year, but like the summer schedule, that's fine.

Q:    Okay.  So when you say you'd like to see your mom a little bit more during the school year, what do you mean, like another overnight or what are you thinking?

A:    Well, like I would just like to be able to actually see her more because I only see her on the weekends.

N.T. Hearing, 9/24/15, at 223-24.  At the conclusion of the interview, counsel for the parties indicated they did not have any questions for Child.

Mother appears to believe that Child's wish to see her more during the week is tantamount to an expression of his desire for Mother to have primary physical custody.  We can discern no support in the record for this position.

Mother notes that the court never directly asked Child which parent he preferred to live with on a daily basis.  While this is true, the court gave Mother's counsel the opportunity to pose questions to Child during the interview, and counsel indicated that he had none.  *Id.* at 230.

In reviewing the issue of Child's preference, which is a factor under both the relocation provision and the best interests analysis, the court noted:

> [Child] expressed a desire to spend time with both parents, but said that that he would like to spend more time with Mother during the school year. He has friends, toys and hobbies at each household, although more of his friends are located near Father's house. The parties have agreed that a mid-week visit would be impractical given the distance between the parties' households. This factor supports a shared agreement, but does not favor one party over the other.

Trial Court Opinion, 10/2/15, at 8.

In light of the record, we can discern no error by the trial court in determining that Child did not express a preference for Mother exercising primary physical custody.

Mother next asserts that the trial court erred by failing to give adequate consideration to the close emotional connection that she and Child share. She argues that the court did not give appropriate weight to Mother's role as the Child's primary caretaker from birth until entry of the August 16, 2013 custody order.

In **M.J.M. v. M.L.G.**, 63 A.3d 331 (Pa. Super. 2013), this Court held that the primary caretaker doctrine no longer exists as a separate factor, but is addressed implicitly in section 5328(a)(3) ("The parental duties performed by each party on behalf of the child") and section 5328(a)(4) ("The need for stability and continuity in the child's education, family life and community life").

Mother places great emphasis on the fact that in the summer of 2014, when Father signed child up for a week of day camp, Child expressed his unhappiness about the situation to Mother rather than to Father. Based on this incident, Mother argues that Child has a closer relationship with her than he does with Father.

Looking to the section 5328(a)(3) and (a)(4) factors, we note the following testimony by Father on direct examination:

Q:    I want you to give the Court a sense of the parental duties or responsibilities you're performing right now for [Child] and have been doing since the last custody trial.

A:    Okay, well, since I've been granted majority custody, it's my responsibility, you know, to make sure that [Child] is safe and sound to get him up for school in the morning, to make sure that he's dressed and ready, to get him breakfast, to get him to school.

If there's any issues at school, he brings them to my attention. I either correspond with the guidance counselor or I correspond with his teacher. You know, I help him with homework in the evenings. I encourage him to do his reading.

You know, other parental roles is that we do chores together. You know, I try to build his sense of community. I get him together with a bunch of the people in our community, whether they be neighbors or the neighbors' kids to play with and so forth.

Q:    Let me break this down. You mentioned chores. Let me start there.

What chores does he have at your house?

A:    Okay. He has actually a list of I think it's like five or six chores, and, if he performs all the chores, he gets x number of dollars a week,

Q:    What are the chores?

- 7 -

A:     Such as keeping his room clean, making his bed, cleaning his bathroom, taking out the trash on Mondays.

I like to enforce these as much as possible, but at the same time he's a young child.  Sometimes they get done, sometimes, they don't.  It depends on the time allowance in our schedule.

Q:     Is there a specific routine you have with academics?

A:     Yes.  You know, I encourage him to do the best that he can in school.  As a matter of fact, yesterday I just went to observe him at school.  It was parent visitation this week.

But, after school when him and I both get home, I ask him to take out his binder, what homework does he have.  He has a lunch box that he takes, so you need to take care of your lunch box, empty out the trash, put the other stuff in the sink.

And then depending upon how much homework he has, we'll either start it then or I'll give him some time to relax before we start it.

Q:     When you say we, what do you mean by we?

A:     Well, certain homework he needs my help with, you know, such as sometimes doing math homework, you know, he'll have questions on it, maybe he didn't a hundred percent understand the lesson that day or maybe it's something that they didn't fully get a chance to review yet, so I'll sit down with him.


. . .


Q:     Now, when I asked you about your parental duties, one thing I didn't hear you talk about was his doctor and dentist appointments.

What [sic] schedules that?

A:     I do take care of that.  I try to share the responsibilities with [Mother].

When [Child] needed to have that tooth pulled she informed that with the limited time that she gets with him she did not want to have to spend her time taking him to the dentist, I understand that to be, okay, that is now my responsibility bar

none, so I don't bother asking anymore. If he needs to go to the doctor, I schedule it.

As [Mother] stated, I was a little slow with the 10-year-old checkup and the 11-year-old checkup, but I'd say it was still done somewhat in the perimeters [sic]. His birthday is in June. I had it done in September. As a matter of fact, I just took him and I scheduled it two or three weeks ago.

But, yeah, I take him to the dentist for routine checkups, for wellness visits, if he's sick, anything like that.

N.T. 9/24/15, at 205-09.

Based on the record, there is evidence to support the trial court's findings with respect to Father's exercise of his parental duties. ***See G.A.***, ***supra***. Accordingly, Mother is not entitled to relief on this claim.

Mother next argues that the court did not adequately consider her full time availability to care for the Child. Section 5328(a)(12) directs the court to consider "each party's availability to care for the child or ability to make appropriate child-care arrangements." 23 Pa.C.S. § 5328(a)(12). With respect to this factor, the court noted:

> Mother does not anticipate the need for daycare. Mother's fiancé is employed seasonally and is semi-retired. He is available to care for [Child] if needed. Father testified that he has an arrangement with his employer to make sure that his work schedule is flexible based on the custody schedule and school closings. Additionally, Father uses a trusted neighbor . . . to provide child care for a short period of time when needed, such as after school.

Trial Court Opinion, 10/2/15, at 9-10.

Child gets dropped off from school every day at approximately 3:35 p.m. Because Father does not get home until an hour later, Child goes to the home of his godmother who lives close to the bus stop. Mother argues:

> It is not appropriate or fair that the child should be with a day care provider or a school friend after school because of Father's work demands when the child could be with Mother. Amazingly, at pages 9 and 10 of its opinion, the trial court ignores this discrepancy and seems to find that both parties have equal ability to provide for the child.

Appellant's Brief, at 29.

In light of the testimony of the parties, it is apparent that the trial court did not abuse its discretion in determining that the parties are equally able to provide care for Child.

Mother next asserts that the trial court erred because it did not give adequate consideration to Child's strong relationship with his infant brother. Section 5328(a)(16) directs the court to consider "the child's sibling relationships." 23 Pa.C.S. § 5328(a)(6). It is apparent that the trial court recognized this factor when it stated, "Mother and her fiancé had a child three weeks before trial. They testified that [Child] is excited to help care for his younger brother. This factor slightly favors Mother." Trial Court Opinion, 10/2/15, at 8.

Mother notes, "the trial court fails to cite the testimony of the child, who indicated directly to the trial court that he enjoys holding and being with his baby brother." Appellant's Brief, at 30. We quote, in its entirety, the testimony Mother believes was critical to the court's determination:

- 10 -

Q:    So you have [a] brother now, right.

A:    Yes.

Q:    His name is?

A:    [],

Q:    You call him –

A:    [] for short.

Q:    And he is only a few weeks old?

A:    Yeah.

Q:    How is it going with him?

A:    Pretty good.

Q:    Have you changed any diapers yet?

A:    No, not me.

Q:    Good.  Try to hold off on that as best you can.

A:    Yeah.

Q:    What do you do with him?

A:    I hold him a lot and he sleeps a lot.

Q:    Have you fed him yet, got to feed him at all?

A:    I don't feed him yet.

N.T. Hearing, 9/24/15, at 220-21.

We do not see how the trial court's failure to reference this testimony or the photographs of Child holding his baby brother, affects the court's conclusion that the existence of a new sibling slightly favors Mother.

Mother next asserts that the trial court erred by failing to consider Father's course of conduct which, she asserts, has discouraged and limited frequent contact between Mother and Child.

Section 5328(a)(13) directs the court to consider "[t]he level of conflict between the parties and the willingness and ability of the parties to cooperate with one another." 23 Pa.C.S. § 5328(a)(13). The 2013 custody order provided: "During summer, if Father needs daycare for more than four (4) consecutive hours on any given day, he shall first offer Mother the time with the child." Custody Order, 8/16/13, at [3]. Mother testified that Father intentionally altered his work schedule to prevent her from exercising her right of first refusal. However, viewing the same facts, Father maintained that he simply arranged his work schedule so that he could spend time with Child.

Mother testified that Father intrudes on her telephone calls with Child, refused to allow her additional custody time for Child to participate in a wedding, and chose to enroll Child in summer camp rather than allow Mother additional custody time. She also testified that Father posted derogatory information about Mother on a Pinterest page.

Father, on the other hand, introduced evidence that in her communications to him regarding custody issues, Mother has used vulgar language.

With respect to the section 5328(a)(13) considerations, the court noted that "[b]oth parties testified that there is a considerable amount of conflict between them, and both cited e-mail and text messages to that effect. The Court finds that this factor presents the only difficulty for a

shared arrangement, but does not favor either party." Trial Court Opinion, 10/2/15, at 10.

Mother essentially challenges the credibility determinations of the trial court. However, it is well settled that we defer to the credibility and weight of the evidence decisions of the trial court. *See G.A.*, *supra*. Accordingly, Mother is entitled to no relief on this issue.

We apply a similar analysis to Mother's contention that she should have primary physical custody because while at Father's house, Child plays video games that include intense violence, strong language and suggestive themes. In the absence of any evidence that Child suffers from any social, academic or emotional difficulties, we defer to the trial court, which weighed Mother's testimony regarding Child's activities at her home (bicycle riding, basketball, Lego) against Father's testimony about Child's activities in his home.

Section 5337(h)(7) directs the trial court to consider "[w]hether the relocation will enhance the general quality of life for the child." 23 Pa.C.S.§ 5337(h)(7). Mother asserts that the court erred when it found:

> [Child] is thriving under the current arrangement, and there is no indication that living with Mother would enhance his life. He would be required to change schools and to move away from friends and family, and there is no financial, emotional, or educational incentive for the relocation other than the ability to spend more time with Mother. This factor weighs heavily against relocation.

Trial Court Opinion, 10/2/15, at 5-6.

- 13 -

Mother draws our attention to the following facts that she believes support reversal of the trial court: (1) she lives with her fiancé and new baby on a 30-acre tract of land that offers opportunities for outdoor play; (2) the family of her fiancé lives in the vicinity; (3) she is a stay-at-home mom; (4) her family has recently traveled to Hawaii and Florida; and (5) she ensures that child attends religious services and says his daily prayers.

Nevertheless, the trial court heard Father's testimony regarding Child's daily life while in his custody. Consistent with this Court's holding that "courts should be reluctant to disturb custody arrangements which have satisfactorily served the best interests of the child," **_Durning v. Balent/Kurdilla_**, 19 A.3d 1125, 1130 (Pa. Super. 2011) (citation omitted), the court weighed the evidence and determined that Father should continue to have primary physical custody. We find no abuse of discretion or error of law.

Section 5328(a)(5) directs the court to consider "availability of extended family." 23 Pa.C.S. § 5328(a)(5). The trial court concluded that:

> Mother and her fiancé have several extended family members within a few minutes of their home. Father lives within driving distance of his extended family, including Paternal Grandparents. All of these family members are actively involved in [Child's] life. Because both parties have extended family in the area, this factor does not favor either party.

Trial Court Opinion, 10/12/15, at 7.

Mother, her fiancé and her fiancé's mother all testified to the large multi-generational extended family that fiancé has near his home. Mother

testified that her father and stepmother live in West York, which is significantly closer to Father's residence than to Mother's.

Mother argues that the trial court's finding "with respect to Father's extended family is not supported by the record in this case." Appellant's Brief, at 36. We disagree. Father testified that his parents live 45 minutes away as do his brother and sister-in-law. He and Child visit them occasionally during the school year, but more so during the summer. Therefore, the court's findings are supported by the record, and Mother is not entitled to relief on this issue.

Mother next asserts that the trial court abused its discretion by noting that Father's scheduling Child's doctor and dentist appointments "slightly favors Father." Trial Court Opinion, 10/2/15, at 7. Mother has cited no authority for the proposition that fulfilling a responsibility that is normally attended to by a custodial parent cannot weigh in that parent's favor when a court determines "the parental duties performed by each party on behalf of the child," 23 Pa.C.S. § 5328(a)(3) and "which party is more likely to attend to the physical . . . needs of the child," 23 Pa.C.S. § 5328(a)(10). Here, the trial court reviewed the record and reached a conclusion based thereon. We thus discern no abuse of discretion or error of law.

Mother's final contention is that the trial court erred by failing to give adequate consideration to Father's financial situation. She draws to our attention that in order to ensure continuation of the custody schedule, Father has changed jobs twice since 2013, which resulted in a reduction in

annual income from $100,000 to $52,000. She further notes that Father has withdrawn funds from his retirement accounts, and may need to refinance his home in the near future.

> The law in Pennsylvania has long been that custody is not to be awarded merely on the basis that a better home in physical aspects, or a higher standard of living can be provided elsewhere. Indeed, in a custody proceeding, the sole permissible inquiry into the relative wealth of the parties is whether either party is unable to provide adequately for the child; unless the income of one party is so inadequate as to preclude raising the children in a decent manner, the matter of relative income is irrelevant.

***Roadcap v. Roadcap***, 778 A.2d 687, 690 (Pa. Super. 1991) (citations and quotations omitted).

Because Father's annual income is clearly adequate to meet the minimum requirement set forth in ***Roadcap***, the trial court did not err by omitting Father's income as a factor in determining custody.

For these reasons, we affirm the trial court's custody order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/18/2016